Richard A. Williamson, Esq. (RW-3033)
FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
Attorneys for the WTCP Cross-Claim Plaintiffs
One Liberty Plaza
New York, New York 10006
(212) 412-9500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                  :       21 MC 97 (AKH)

IN RE SEPTEMBER 11 LITIGATION      :

                                                  :

------------------------------------------------------------X
                                                  :

THIS DOCUMENT APPLIES TO ALL CASES      :

                                                  :

------------------------------------------------------------X

**WTCP CROSS-CLAIM PLAINTIFFS' COUNTER-STATEMENT PURSUANT
TO LOCAL RULE 56.1 IN OPPOSITION TO DEFENDANTS US AIRWAYS,
INC.'S, US AIRWAYS GROUP, INC.'S AND COLGAN AIR, INC.'S MOTIONS
FOR SUMMARY JUDGMENT WITH RESPECT TO FLIGHT 175 CLAIMS**

Pursuant to Local Civil Rule 56.1, Cross-Claim Plaintiffs World Trade Center Properties

LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5

World Trade Center LLC, and 7 World Trade Company, L.P. (together, the "WTCP Cross-Claim

Plaintiffs") submits this counter-statement of facts in opposition to Defendants US Airways, Inc.,

US Airways Group, Inc.'s (together "US Airways"), Colgan Air, Inc.'s ("Colgan"), and

Continental Airlines, Inc.'s ("Continental") respective motions for summary judgment with

respect to WTCP Cross-Claim Plaintiffs' Flight 175 claims (together, the "Moving Defendants'

motions").

**Response To Moving Defendants' Rule 56.1 Statements**

      **A.    WTCP Cross-Claim Plaintiffs' Counterstatement to
            US Airways' 56.1 Statement**

1.      With respect to the statements asserted in paragraph "1" of US Airways' 56.1

Statement, the WTCP Cross-Claim Plaintiffs do not dispute that suspected September 11 terrorist

ringleader Mohammed Atta ("Atta") and his accomplice Abdul Aziz Al Omari ("Omari") were

permitted by US Airways to board Colgan Flight 5930 for travel to Logan Airport on September 11 and that Atta and Omari did not board United Airlines Flight 175 with any of Atta's and Omari's co-conspirators. A genuine issue of material fact exists, however, with respect to the locations, movements and communications of Atta and Omari once they arrived at Logan. Due to the fact that there is outstanding discovery from various Aviation Defendants and the government concerning the locations, movements and communications of Atta and Omari once they arrived at Logan, including outstanding discovery from US Airways regarding its operations at Logan, Cross-Claim Plaintiffs cannot, at this time, present facts to controvert the statement made in paragraph 1. *See* accompanying Declaration of Richard Williamson, dated Apr. 27, 2007 (the "Williamson Decl.").

2.    The WTCP Cross-Claim Plaintiffs do not contest the statements asserted in paragraph "2" of US Airways' 56.1 Statement.

3.    The WTCP Cross-Claim Plaintiffs do not contest the statements asserted in paragraph "3" of US Airways' 56.1 Statement.

4.    With respect to paragraph "4" of US Airways' 56.1 Statement, US Airways' statement is palpably improper in that it does not state an issue of fact, but states a baseless legal conclusion. Nevertheless, as set forth in the WTCP and PANYNJ Cross-Claim Plaintiffs' Joint Memorandum of Law in Opposition to Defendants US Airways, Inc.'s, US Airways Group, Inc.'s, Colgan Air, Inc.'s and Continental Airlines, Inc.'s Motions for Summary Judgment With Respect to The WTCP and PANYNJ Cross-Claim Plaintiffs' Flight 175 Claims Against Them (the "Opposition Brief"), various statutory, regulatory, and common-law duties were owed by US Airways to the civil aviation system, and consequently, to the Cross-Claim Plaintiffs.

5.    With respect to the statements asserted in paragraph "5" of US Airways' 56.1 Statement, the WTCP Cross-Claim Plaintiffs' object to said statements as palpably improper in that they do not state issues of fact, but instead state baseless legal conclusions. Nevertheless, as set forth in the Opposition Brief, questions of law and fact exist whether US Airways' breached

any of the duties outlined in the Opposition Brief and, accordingly, whether such breaches proximately caused that part of the September 11 conspiracy related to Flight 175.

**B.    WTCP Cross-Claim Plaintiffs' Counterstatement
to Colgan' 56.1 Statement**

6.    With respect to the statements asserted in paragraph "1" of Colgan's 56.1 Statement, the WTCP Cross-Claim Plaintiffs do not dispute that Colgan "operated at Portland International Jetport" on September 11 and, furthermore, that Colgan and US Airways entered into a Code Share Agreement ("Code Share Agreement"), a copy of which is attached as Exhibit 2 to the Williamson Decl. However, Colgan's statement that it "was not responsible for" the ticketing, checkpoint screening and boarding procedures for terrorists Atta and Omari is contrary to the provisions of the Code Share Agreement and is otherwise an improper and baseless legal conclusion. Specifically, Article 1 of the Code Share Agreement provides that Colgan shall abide by "any and all applicable statutes, orders, rules, and regulations...of all governmental agencies having jurisdiction over [Colgan]'s operations, including but not limited to, the Federal Aviation Administration (FAA) and the DOT." As set forth in the Opposition Brief, as an air carrier operating out of Portland on September 11, Colgan, at a bare minimum, had statutory and regulatory safety and security obligations to provide prescreening, checkpoint screening, and checked baggage layers of security for its flights. *See* Opposition Brief, Point III. Among its obligations was the requirement to maintain an FAA-approved Air Carrier Standard Security Program, (hereinafter "ACSSP"), Ex. 1 to the Williamson Decl. *Id.* Colgan's/US Airways' Code Share Agreement delegated certain of the safety and security duties outlined in the ACSSP to US Airways. *See* § 305(b) of the Code Share Agreement, Ex. 2 to the Williamson Decl. US Airways employed the ticket agents, Ground Security Coordinators and other personnel to perform prescreening, checked baggage and related supervisory duties, and US Airways contracted with Globe Aviation Services, a private security company, to fulfill US Airways'/Colgan's security obligations to provide checkpoint security services. *See* General Terms Agreement for Pre-Departure Screening, Skycap and Other Services between USAir, Inc.

and Globe Aviation Services Corporation, Ex. 3 to the Williamson Decl.  Thus, US Airways' and Globe's failures on September 11 as to the security obligations Colgan delegated to US Airways are, as a matter of law, Colgan's failures.

Finally, due to the fact that there is outstanding discovery from Colgan, including but not limited to, documents reflecting to its operations at Portland and Logan and its relationship with US Airways, the WTCP Cross-Claim Plaintiffs cannot, at this time, present further facts to controvert the statements made regarding same.  *See* Williamson Decl., at ¶¶ 2-21.

7.    With respect to the statements asserted in paragraph "2" of Colgan's 56.1 Statement, the WTCP Cross-Claim Plaintiffs do not dispute that suspected September 11 terrorist ringleader Atta and his co-conspirator and accomplice Omari were permitted by US Airways/Colgan to board Colgan Flight 5930 for travel to Logan Airport on September 11, 2001. A genuine issue of material fact exists, however, with respect to the locations, movements and communications of Atta and Omari once they arrived at Logan.  Due to the fact that there is outstanding discovery from various Aviation Defendants and the government, including outstanding discovery from Colgan, concerning the locations, movements and communications of Atta and Omari once they arrived at Logan, Cross-Claim Plaintiffs cannot, at this time, present facts to controvert the statement made in paragraph 2.  *Id.*

8.    The WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "3" of Colgan's 56.1 Statement.

9.    The WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "4" of Colgan's 56.1 Statement.

10.    The WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "5" of Colgan's 56.1 Statement.

11.    The WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "6" of Colgan's 56.1 Statement.

12.    The WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "7" of Colgan's 56.1 Statement.

13.     The WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "8" of Colgan's 56.1 Statement.

14.     With respect to the statements asserted in paragraph "9" of Colgan's 56.1 Statement, the WTCP Cross-Claim Plaintiffs object to Colgan's statement that "[t]here is no relation between Colgan and the five hijackers that boarded United Flight 175" because the statement is a palpably improper and constitutes baseless legal conclusion, not a statement of fact. Nevertheless, as set forth in the Opposition Brief, it is a question of fact for the jury to decide whether Colgan breached any of the duties outlined therein and, as such, whether such failures proximately caused that part of the September 11th conspiracy related to Flight 175. The WTCP Cross-Claim Plaintiffs do not dispute that Colgan did not hire, train or supervise United Airlines' security checkpoint contractors at Logan.

15.     With respect to the statements asserted in paragraph "10" of Colgan's 56.1 Statement, the WTCP Cross-Claim Plaintiffs object to Colgan's statement that "[t]here is no evidence that supports a claim of negligence on the part of Colgan related to United Flight 175" because the statement is a palpably improper and constitutes a baseless legal conclusion, not a statement of fact. Nevertheless, as set forth in the Opposition Brief, it is a question of fact for the jury to decide whether Colgan breached any of the duties outlined therein and, as such, whether such failures proximately caused that part of the September 11th conspiracy related to Flight 175.

16.     The WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "11" of Colgan's 56.1 Statement

17.     The WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "12" of Colgan's 56.1 Statement.

**C.     WTCP Cross-Claim Plaintiffs' Counterstatement
to Continental's 56.1 Statement**

18.     The WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "1" of Continental's 56.1 Statement.

19.    The WTCP Cross-Claim Plaintiffs do not dispute that part of the statement asserted in paragraph "2" of Continental's 56.1 Statement that "Continental did not ticket" September 11 terrorist ringleader Atta and his con-conspirator and accomplice Omari and that "U.S. Airways", among others (including Continental), "was responsible for the screening" Atta and Omari. However, with respect to the remaining statements asserted in paragraph "2" of Continental's 56.1 Statement, the WTCP Cross-Claim Plaintiffs object to the statements that Colgan was not "responsible for the screening" of Atta and Omari and that Continental "did not have responsibility for screening" Atta and Omari on September 11 because the statements are palpably improper and constitute baseless legal conclusions, not statements of fact.

With respect to Continental's allegations concerning Colgan, asserted in paragraph "2" of Continental's 56.1 Statement, genuine questions of law and fact exist whether Colgan was, in part, "responsible for the screening of" Atta and Omari on September 11. Specifically, Article 1 of the Code Share Agreement provides that Colgan shall abide by "any and all applicable statutes, orders, rules, and regulations...of all governmental agencies having jurisdiction over [Colgan]'s operations, including but not limited to, the Federal Aviation Administration (FAA) and the DOT." As set forth in the Opposition Brief, as an air carrier operating out of Portland on September 11, Colgan, at a bare minimum, had statutory and regulatory safety and security obligations to provide prescreening, checkpoint screening, and checked baggage layers of security for its flights. *See* Opposition Brief, at Footnote 1. Among its obligations was the requirement to maintain an FAA-approved ACSSP, Point III. *Id.* Colgan's/US Airways' Code Share Agreement delegated certain of the safety and security duties outlined in the ACSSP to US Airways. *See* § 05(b) of the Code Share Agreement, Ex. 2 to the Williamson Decl. US Airways employed the ticket agents, Ground Security Coordinators and other personnel to perform prescreening, checked baggage and related supervisory duties and US Airways contracted with Globe Aviation Services, a private security company, to fulfill US Airways'/Colgan's security obligations to provide checkpoint security services. *See* General Terms Agreement for Pre-

Departure Screening, Skycap and Other Services between USAir, Inc. and Globe Aviation Services Corporation, Ex. 3 to the Williamson Decl.

With respect to Continental itself, genuine questions of law and fact exist whether Continental had any "responsibility for screening" Atta and Omari. Continental was an air carrier operating out of Portland International Jetport on September 11. *See* Airport Security Program for Portland International Jetport ("Portland ASP"), at COP000045-56, Ex. 13 to the Williamson Decl. Furthermore, on September 11, the Portland airport had *one* checkpoint, which was operated by Globe Aviation Security. *See 9/11 Commission Staff Monograph on the Four Flights and Civil Aviation Security,* ("Staff Monograph")*,* at 3 (Sept. 12, 2005)*,* Ex. 6 to the Williamson Decl. <u>All</u> of the air carriers operating out of Portland, including Continental, had shared responsibility for the Portland checkpoint. *See* "Shared Responsibility Agreement – PWM", Ex. 75 to the Williamson Decl.

Finally, due to the fact that Continental has failed to produce any documents or witnesses for depositions to date, including but not limited to, documents and testimony concerning Continental's responsibilities for and relationship to the Portland checkpoint as of September 11, Cross-Claim Plaintiffs cannot, at this time, present further facts to controvert the statements made regarding same. *See* Williamson Decl., at ¶¶22-28.

20.    With respect to the statements asserted in paragraph "3" of Continental's 56.1 Statement, the WTCP Cross-Claim Plaintiffs object to the statement that "it is beyond dispute that Continental" did not "have any responsibilities with regard to Colgan's and/or US Airways' flight operations in the Portland Jetport," because the statement is a legal conclusion, not a statement of fact. Furthermore, genuine questions of law and fact exist concerning Continental's responsibility for the Portland checkpoint as of September 11. *See* ¶ 19, *supra.* Finally, owing to the fact that Continental has failed to produce any documents or witnesses for depositions to date, including but not limited to, documents and testimony concerning Continental's responsibilities for and relationship to the Portland checkpoint as of September 11, Cross-Claim

Plaintiffs cannot, at this time, present further facts to controvert the statements made regarding same. *See* Williamson Decl., at ¶¶ 22-29.

21.     With respect to the statements asserted in paragraph "4" of Continental's 56.1 Statement, the WTCP Cross-Claim Plaintiffs object to the statements as baseless legal conclusions. Continental's 56.1 Statement fails to inform and explain to the Court, as its duty on this motion, the relationship between Continental and the Portland checkpoint on September 11. As established in ¶¶ 19, *supra*, Continental was an air carrier operating out of Portland on September 11. The Portland airport had one checkpoint shared by all of the airlines operating there which was operated by Globe Aviation Security. Based upon various documents, Continental had "shared responsibility" for the Portland checkpoint as of September 11. *See* ¶ 19, *supra*. Finally, owing to the fact that Continental has produced *no discovery at all* in this case, Cross-Claim Plaintiffs cannot, at this time, present further facts to controvert the statements made in paragraph "4" of Continental's 56.1 Statement. *See* Williamson Decl., at ¶¶ 22-29.

22.     The WTCP Cross-Claim Plaintiffs object to the statements made in paragraph "5" of Continental's 56.1 Statement because they are baseless legal conclusions, not statements of fact. Furthermore, genuine questions of law and fact exist regarding Continental's shared responsibility for and relationship with the Portland Checkpoint. *See* ¶¶ 19, 20 and 21, *above*.

23.     With respect to paragraph "6" of Continental's 56.1 Statement, the WTCP Cross-Claim Plaintiffs do not dispute that September 11 terrorist ringleader Atta and his accomplice Omari ultimately boarded Flight 11 and not Flight 175.

24.     With respect to paragraph "7" of Continental's 56.1 Statement, the WTCP Cross-Claim Plaintiffs state that material issues of fact exist concerning the locations, movements, and communications of Atta and Omari once the two terrorists deplaned the Colgan flight at Logan. *See* ¶¶ 1 and 7, *supra*.

25.     Although no discovery has been produced by Continental to date, the WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "8" of Continental's 56.1 Statement.

26.     Although no discovery has been produced by Continental to date, the WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "9" of Continental's 56.1 Statement.

27.     Although no discovery has been produced by Continental to date, the WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "10" of Continental's 56.1 Statement.

28.     Although no discovery has been produced by Continental to date, the WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "11" of Continental's 56.1 Statement.

29.     Although no discovery has been produced by Continental to date, the WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "12" of Continental's 56.1 Statement.

30.     With respect to the statements asserted in paragraph "13" of Continental's 56.1 Statement, the WTCP Cross-Claim Plaintiffs object to the statement that "Continental had no duty or obligation to screen passengers for other carriers' flights" and that "Continental had no involvement in any way … with the contractors who staffed" the checkpoints to the extent the statement relates to Continental's shared responsibility for and relationship with Globe Aviation Security out of Portland. *See* ¶¶ 9, 21, and 22, *supra*. The WTCP Cross-Claim Plaintiffs do not dispute the other statements asserted in paragraph "13" of Continental's 56.1 Statement that the September 11 terrorist conspirators "were not screened in any way at Continental's passenger screening checkpoints at Logan."

31.     The WTCP Cross-Claim Plaintiffs do not dispute the statements asserted in paragraph "14" of Continental's 56.1 Statement.

**The WTCP Cross-Claim Plaintiffs' Statement of Additional Genuine Issues of Material Fact That Are Relevant to the Moving Defendants' Motions**

32.     In addition to the genuine issues of material fact identified in ¶¶ 1-31, above, the following facts demonstrate that there are genuine issues of material fact as to what the Moving

Defendants knew or should have known on September 11, 2001 about the imminent threat to domestic civil aviation posed by Middle Eastern terrorists and as to what the Moving Defendants knew or should have known on September 11, 2001 about the imminent threat of a simultaneous coordinated series of attacks on multiple airliners and aviation facilities undertaken by such Middle Eastern terrorists:

a)      In 1993, terrorist mastermind Ramzi Yousef and a group of Middle East conspirators successfully bombed the World Trade Center and this attack sent "a signal that it is possible for terrorists to operate in the United States." GAO Report., *Aviation Security: Additional Actions Needed to Meet Domestic and International Challenges*, XC001707 at 22 (Jan. 27, 1994), Ex. 30 to the Williamson Decl.

b)      Just one year later, Ramzi Yousef focused his terrorist plans at U.S. commercial aviation when he planned the "Bojinka plot," the plot to simultaneously bomb 12 U.S. commercial planes over the Pacific Ocean. *9/11 and Terrorist Travel: Staff Report of National Commission on Terrorist Attacks Upon the United States*, XC009230 at 463, Ex. 31 to the Williamson Decl. *See also* Peter St. John, *Air Piracy, Airport Security and International Terrorism: Winning the War against Hijackers* XC091544 at 53 (Quorum Books 1991), Ex. 32 to the Williamson Decl.

c)      Ramzi Yousef's plot to conduct multiple, simultaneous attacks on aviation was nothing novel. In fact, almost three decades before September 11, various Middle Eastern terrorist cells organized and executed multiple near-simultaneous hijackings of four commercial airliners. *See* Peter St. John, *Air Piracy, Airport Security and International Terrorism: Winning the War against Hijackers* XC091544 at 53 (Quorum Books 1991), Ex. 32 to the Williamson Decl.; *see also Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001*, XC050737 at 41 (Dec. 20, 2002), Ex. 33 to the Williamson Decl.; and Staff Monograph, at 54, Ex. 6 to the Williamson Decl.

d)    In 1994, Algerian Islamic fundamentalists hijacked a commercial airline and threatened to suicide crash it into the Eiffel tower. *See Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001*, XC050737 at 41 (Dec. 20, 2002), Ex. 33 to the Williamson Decl.

e)    In 1995, the National Intelligence Estimate, a coordinated group of 16 different intelligence agencies, "highlighted the growing domestic threat of terrorist attack" and, noted that, civil aviation "remain[ed] a particularly attractive target in light of the fear and publicity that the downing of an airline would evoke and the revelations last summer of US air transport sector's vulnerabilities." Staff Monograph, at 54, Ex. 6 to the Williamson Decl.

f)    That same year, the FAA raised the terrorist alert level for civil aviation to Level 3, a "very high threat level," which remained in place through September 11, and which:

>    [i]ndicate[d] that a terrorist group or other hostile entity with a known capability of attacking civil aviation is likely to carry out attacks against US targets; or civil disturbances with a direct impact on civil aviation have begun or are imminent.

*See* United States Department of Transportation ("DOT"), *Changing Face of Transportation*, XC026896 at 901, Ex. 34 to the Williamson Decl.; *U.S. v. Moussaoui* Trial Tr., Testimony of Robert J. Cammaroto, FAA/TSA Chief of Commercial Airport Policy, Chief of the Security Directives Working Group XC053564 at 709 (Mar. 22, 2006), Ex. 35 to the Williamson Decl.; *see also* Staff Monograph, at 54, Ex. 6 to the Williamson Decl.; US Airways, Air Carrier Standard Security Program, US-000879 at 1141, Ex. 1 to the Williamson Decl.

g)    1996 brought "one of the deadliest hijackings in history," when three Islamic men hijacked Ethiopian Airlines Flight 961 and tried to "turn the hijacking into a suicide mission by crashing into a resort." DOT/Federal

Aviation Administration ("FAA"), *Criminal Acts Against Civil Aviation*, XC026807 at 52-53 (1996), Ex. 36 to the Williamson Decl

h)      In 1997, the FAA warned of the rapidly growing Middle Eastern terrorist threat, which had established support structures in the United States, and who considered civil aviation an attractive target for their operations, and who could strike with little or no warning. *See* DOT/FAA, *Security Directive: Threat to Air Carriers*, XC059785 at 86 (May 8, 1997), Ex. 37 to the Williamson Decl.; *see also* DOT/FAA, *Security Directive: Threat to Air Carriers* XC059832 at 34 (Oct. 27, 1997), Ex. 38 to the Williamson Decl.

i)      In 1998, Osama Bin Laden declared war on America in a nationally televised interview on an ABC new magazine.  Bin Laden threatened that he did "not differentiate between those dressed in uniforms and civilians," that he "predict[ed] a black day for America," and that he would "bring the fight to America, like Ramzi Yousef and others." *See* Trial testimony in *U.S. v. Moussaoui* transcribing verbatim the ABC News John Miller interview with Osama bin Laden (Jun. 10, 1998).

j)      In 1998, Bin Laden's deputy, Aaymon al Zawahiri, also issued a "fatwa", *i.e.*, an Islamic legal pronouncement, to kill Americans worldwide. *See* DOT/FAA, *Civil Aviation Security Information Circular* at XC060123 (Dec. 14, 1998), Ex. 40 to the Williamson Decl.

k)      Also in 1998, an Islamic leader in the United Kingdom proclaimed that Osama Bin Laden would crash an airliner or hijack a plane to humiliate the United States. *See* DOT/FAA, *Criminal Acts Against Civil Aviation,* XC043566 at 618 (1999), Ex. 41 to the Williamson Decl.

l)      The FAA specifically warned the airlines that these threats and that Bin Laden's future targets "could include civil aviation." DOT/FAA, *Civil Aviation Security Information Circular*, XC060108 at 9 (Feb. 28, 1997), Ex. 42 to the Williamson Decl.

m)      Al Qaeda began executing on their declarations of war when a group of conspirators successfully performed multiple, near simultaneous suicide

truck bombing attacks on two U.S. embassies in Africa, "a watershed event in the level of attention given to Usama Bin Laden." *9/11 Commission Staff Statement No. 8*, XC009553 at 56, Ex. 28 to the Williamson Decl.

n)  During the subsequent trial of four of the captured conspirators who were involved in those coordinated bombings of American embassies, the DOT specifically warned the airlines that Bin Laden's training camps in Afghanistan included "specialized schools for training in electronics and flying aircraft." DOT, *Transportation Security and Terrorism Review: USA v. Usama bin Laden*, AAL021009 at 14, Ex. 43 to the Williamson Decl.

o)  In 2000, the airlines were warned that the threat of terrorist hijackings to US civil aviation was increasing:

> In light of the successful hijacking of Indian Airlines 814, we believe that the situation has changed. We assess that the prospect for terrorist hijackings has increased and that *U.S. airliners could be targeted in an attempt to obtain the release of indicted or convicted terrorists imprisoned in the United States.*

DOT, *Civil Aviation Security Information Circular*, XC060153 at 53-54 (Apr. 27, 2000), (emphasis added), Ex. 44 to the Williamson Decl.

p)  The FAA stated that the "fact that the year saw a 75% increase in hijackings and other attacks on aviation proved premature any though that such incidents were declining." DOT/FAA, *Criminal Acts Against Civil Aviation*, AAL017080 at 128 (2000), Ex. 45 to the Williamson Decl.

q)  The statistics supported the FAA's warnings. Indeed, the 9/11 Commission explained that:

> hijacking had always been the most prevalent means of attacking civil aviation. According to the Rand-St. Andrews University chronology of terrorist attacks, between 1972 and 1996 hijacking represented 87 percent of attacks against civil aviation. Between 1996 and 2000 there were 64 hijackings but only 3 incidents of sabotage…As of 2000, the incidence of hijacking was on the increase worldwide.

Staff Monograph, at 58, Ex. 6 to the Williamson Decl.

r)      That year, the airlines were again warned by the FAA that the "Usama Bin
        Laden network is considered the single most serious threat to the United
        States … at the present time," that "Usama bin Laden allegedly issued a
        communiqué that threatened, in part, '… to bring down … aircraft and
        hijack them'" and, moreover, that "instruction in hijacking techniques is
        being provided in Bin Laden's Afghanistan training camps." FAA,
        *Memorandum: Worldwide Threat Questions and Answers*, XC036156 at
        67, 73 (Oct. 30, 2000), Ex. 46 to the Williamson Decl.

s)      Clearly, with respect to hijacking techniques, the airlines knew or should
        have known that knives were one of the three most commonly used
        weapons in hijackings. *See* United Airlines, *Security Instructor Guide,*
        XC035144 at 51 (2000), Ex. 47 to the Williamson Decl.

t)      The terrorist threat to civil aviation grew astronomically in 2001. In early
        2001, the DOT reported on then-CIA Director George Tenet's testimony
        before Congress that "the most serious threat overall … that the United
        States faces worldwide comes from Islamic extremists, most notably
        Usama Bin Laden." DOT/FAA, *Terrorist Threat Overview for the United
        States*, AAL021018 at 20, Ex. 48 to the Williamson Decl. The DOT
        concluded that "it is believed that the threat *within* the United States has
        *increased*." *Id.* at 23.

u)      In the spring of 2001, the FAA went so far as to travel to the country's
        largest airports, including Logan, to give a PowerPoint presentation to the
        airlines. The presentation dramatically brought to life the clear and
        present danger of possible multiple attacks to civil aviation posed by the
        terrorists. Among the various threats to civil aviation, the presentation
        specifically discussed the Bojinka plot to simultaneously blow up 12 US
        Airliners. Civil Aviation Security Intelligence PowerPoint Presentation:
        the Trans-National Threat to Civil Aviation, at slide 15, Ex. 49 to the
        Williamson Decl. The FAA presentation also focused attention on the

14

"Millennium Plot" which potentially involved multiple simultaneous
attacks by Middle Eastern on United States airports during the millennial
celebrations. *Id.* at slides 10-17.

v)    The FAA presentation also discussed the potential for domestic hijackings
by Middle East terrorists which would "likely result in a greater number of
American hostages but would be operationally more difficult… if
however, the intent of the hijacker is not to exchange hostages for
prisoners, but to commit suicide in a spectacular explosion, a domestic
hijacking would probably be preferable." *Id,* at slide 24; *see also* Staff
Monograph, at 59.

w)    In July 2001, the FAA, as part of its proposed rulemaking, publicly
reinforced its repeated warnings that Middle Eastern terrorist groups were
present in the United States, that, as a result, the threat level would likely
rise in the future, that these terrorists were willing to conduct attacks
intended to bring about indiscriminate casualties, and that civil aviation
was an attractive target for the terrorists because of the known weaknesses
in the airlines' security practices. *See* Final Rule on Airport Security for
Department of Transportation and Federal Aviation Administration, 66
Fed. Reg. 37,274 (July 17, 2001) (to be codified at 14 C.F.R. pts. 107 and
139), XC061373 at 413, Ex. 50 to the Williamson Decl. The FAA also
specifically warned in connection with that rulemaking that the terrorists
can "operate in small groups" and cited to the Bojinka plot as an example.
*Id.*

x)    The Middle Eastern terrorist threat to civil aviation was "foremost in the
minds of FAA security officials during the summer of 2001." Staff
Monograph, at 55, Ex. 6 to the Williamson Decl.

y)    The rapidly growing domestic threat was also recognized by Massport
public safety director, Joe Lawless. *See* Deposition Transcript of Joseph
Lawless ("Lawless Tr.") at 69:22-25, 73:19-74:12, 75:5-76:5, 82:14-17,
109:4-9, 124:3-15, 151:19-154:3, Ex. 51 to the Williamson Decl.

z)    The FAA issued numerous security directives and information circulars in the months leading up to September 11. *See* Staff Monograph, at 55-56, Ex. 6 to the Williamson Decl. For instance, at the end of July, the FAA warned the airlines about "reports of possible near-term terrorist operations" and, although mentioning the "Arabian Peninsula and/or Israel" as one possible target of these near-term attacks, the FAA's warning explicitly and clearly stated that the "threat is not solely confined to the Middle East." DOT/FAA, *Civil Aviation Security Information Circular*, US-001381 at 82 (July 31, 2001), Ex. 54 to the Williamson Decl.

aa)    The FAA had been repeatedly "encourage[ing] all U.S. carriers to exercise prudence and demonstrate a high degree of alertness." DOT/FAA, *Civil Aviation Security Information Circular*, AAL011970 (July 18, 2001), Ex. 55 to the Williamson Decl.

ab)    Just six days prior to September 11 at a Massport security meeting, Mr. Lawless, who distributed copies of other recent FAA information circulars concerning the Middle Eastern terrorist threat, specifically warned that all airline security personnel needed to be "*extra vigilant.*" Massport Public Safety Staff Meeting Minutes, XC103650 at 51 (Sept. 5, 2001), Ex. 56 to the Williamson Decl.

33.    In addition to the genuine issues of material fact identified in ¶¶ 1-32, above, the facts set forth in ¶ 32 and the facts set forth below demonstrate that there are genuine issues of material fact as to what the Moving Defendants knew or should have known on September 11, 2001 about Atta and Omari, about Atta's and Omari's intentions and actions, about the contents of Atta's and Omari's checked and carry-on luggage, about the weapons and other suspicious items carried on the persons of Atta and Omari and/or in their carry-on luggage, about Atta's and Omari's potential to be participating at that moment in an on-going terrorist attack and about Atta's and Omari's potential to be participating at that moment in an on-going terrorist attack

that represented one aspect of a larger series of coordinated simultaneous attacks on multiple airliners, aviation facilities and other targets:

a)       Michael Tuohey, US Airways' ticket agent first noticed Atta and Omari at 5:40 am outside the US Airways' first class ticket counter "look[ing] a little confused." Jerry Harways, *Encounter Haunts Ex-Ticket Agent,* Portland Press Herald, Sept. 11, 2006, XC093270 at 71, Ex. 4 to the Williamson Decl.; *see also* Deposition Transcript of Michael Tuohey ("Tuohey Tr.") at 284:22-285:4, Ex. 5 to the Williamson Decl. At the time Mr. Tuohey checked the terrorists in, they only had *17 minutes* to spare to successfully navigate all of US Airways' prescreening, checkpoint screening, and checked baggage layers of security,[1] and to board a US Airways/Colgan flight to Logan Airport for connection to American Airlines Flight 11. *See* Staff Monograph, at 1-2, Ex. 6 to the Williamson Decl.; Tuohey Tr. at 166:12-15; 169:23-170:16; 232:15-18; 248:16-249:3; 291-298, Ex.5 to the Williamson Decl. Mr. Tuohey admitted that as of September 11, US Airways "was all set up for the convenience of passengers," *See* Touhey Tr. at 140:25-141:2, Ex. 5 to the Williamson Decl.) so he "didn't think anything of" the fact that the terrorists were checking in so close to departure. Mel Allen, *The Maine Connection,* Yankee Magazine, Sept. 2006, XC093266 at 67, Ex. 7 to the Williamson Decl.[2]

---

[1] "Prescreening" is a layer of security that involves the various security procedures that take place at the ticket counter, such as asking passengers questions, verifying identification, and checked baggage security issues. Staff Monograph at 70-72, Ex. 6 to the Williamson Decl. The checkpoint screening layer of security involves, at a minimum, the procedures to prevent passengers from carrying prohibited weapons onto the airplane. *Id.* at 70. Checked baggage screening relates to security procedures to safeguard against dangers in non-carry-on bags. *Id.*

[2] At his deposition, Mr. Tuohey, testified that, with regard to his media appearances and interviews, he was being truthful "all the way" about his experiences on September 11th checking in Atta and Omari and his understanding of US Airways' protocols as of that date. *See* Tuohey Tr. at 279:10-280, 282-83, 292:19-24, 293:7-298:14, Ex. 5 to the Williamson Decl.

b)    When he accessed US Airways' computer system to issue the terrorists their boarding passes, Mr. Tuohey, a ticket agent with decades of experience, was alerted that Atta was designated by the government-approved "CAPPS" system[3] as a "selectee" (Staff Monograph, at 2, Ex. 6 to the Williamson Decl.), *i.e.*, a potential threat to the aircraft. Deposition Transcript of Doreen Carbone, ("Carbone Tr."), at 173:21-22, Ex. 9 to the Williamson Decl.

c)    Mr. Tuohey also stated that he found it "very unusual" that the terrorists had two "[o]ne way first class tickets to Boston, [at] $2,400 apiece." Mel Allen, *The Maine Connection, supra*, XC093266 at 67, Ex. 7 to the Williamson Decl. *See also* Tuohey Tr. at 164:12-14, 291-298, Ex. 5 to the Williamson Decl. He admitted that "[t]here are certain things in my job you are trained for that red-flags danger. One is adult males with a one-way ticket paying in cash." Greg Szymanski, *New Questions About Real Identity of 9/11 Hijackers*, American FreePress.Net, Mar. 21, 2005, XC093257 at 58, Ex. 10 to the Williamson Decl.

d)    Mr. Tuohey also "thought it was a little unusual that [Atta and Omari] presented New Jersey licenses when they were flying to Los Angeles, California."[4] Federal Bureau of Investigation Interview of Michael F. Tuohey, US-001569 at 73 (Sept. 12, 2001), Ex. 11 to the Williamson Decl.; *see also* Michael Tuohey Interview with the 9/11 Commission, US-001556 at 62, Ex. 12 to the Williamson Decl.; Tuohey Tr. at 280:7-283:12, Ex. 5 to the Williamson Decl.

e)    Furthermore, he told the FBI that he "thought it was a little unusual that Atta and Alomari would fly U.S. Air and then make a connecting flight to

---

[3] Staff Monograph, at 2, Ex. 6 to the Williamson Decl. ("CAPPS was an FAA-approved automated system run by the airlines that scored each passenger's profile to identify those who might pose a threat to civil aviation."); *The 9/11 Commission Report*, XC002058 at 519, Ex. 8 to the Williamson Decl.

[4] It was later determined that the terrorists presented Florida licenses, not New Jersey licenses. *See* Tuohey Tr. at 165:15-17, 278:7-279:21, *but see* Tuohey Tr. at 165:18-25, Ex. 5 to the

American [Airlines] out of Boston to Los Angeles" because American Airlines also flew out of Portland.  Federal Bureau of Investigation Interview of Michael F. Tuohey, US-001569 at 74, Ex. 11 to the Williamson Decl.;*see also* Airport Security Program for Portland International Jetport, COP000001 at 46, Ex. 13 to the Williamson Decl. (American Eagle is on Portland's list of air carriers); Tuohey Tr. at 169:23-170:16, Ex. 5 to the Williamson Decl.

f)      Mr. Tuohey made eye contact with Atta because he refused to give Atta his connecting American Airlines boarding pass and the two "locked eyes."  Mel Allen, *The Maine Connection*, *supra*, XC093266 at 67, Ex. 7 to the Williamson Decl. *See also* Tuohey Tr. at 293:15-22, Ex. 5 to the Williamson Decl.  Mr. Tuohey stated that this exchange "sent chills through" him, caused the hair on the back of his neck to stand up, and his "stomach churned."  David Hench, *Ticket Agent Haunted by Brush with 9/11 Hijackers*, Portland Press Herald, March 6, 2005, XC093261 at 63, Ex. 14 to the Williamson Decl.; *see also* Tuohey Tr. at 173:19-174:3, 175:18-176:3, 298:3-14, Ex. 5 to the Williamson Decl.; Michael Smerconish, *He Looked Terror In The Eye And Blinked*, www.mastalk.com, Feb. 24, 2005, XC093254 at 55, Ex. 15 to the Williamson Decl.

g)      Mr. Tuohey has said that Atta "looked like a walking corpse," was a "*poster boy for terrorists*," "had the deadest eyes [he had] ever seen," and that looking at Atta was akin to looking at "the skull on a poison bottle." Michael Smerconish, *He Looked Terror In The Eye And Blinked, supra*, XC093254 at 55, Ex. 15 to the Williamson Decl.; Transcript from The Oprah Winfrey Show ("Oprah Tr.") (Sept. 12, 2005), XC058696 at 98, (emphasis added), Ex. 16 to the Williamson Decl.; Transcript from CNN's "Paula Zahn Now" ("Paula Zahn Now Tr.") (Jan. 18, 2005), XC051737 at 38, Ex. 17 to the Williamson Decl.; David Hench, *Ticket Agent Haunted*

---

Williamson Decl. (where Tuohey states that he did not consider it unusual that Atta and Omari presented Florida licenses).

*by Brush with 9/11 Hijackers*, XC093261 at 64, Ex. 14 to the Williamson Decl.; *see also* Tuohey Tr. at 173:14-17, 195:7-13, 292:19-294:8, Ex. 5 to the Williamson Decl.

h)    In a five year anniversary interview of the September 11 attacks, Mr. Tuohey described his reaction to Atta as follows:

> Everybody knows the pictures of the guy now. That cold, hard picture. Well that is a warm and cuddly look compared to what I saw. My stomach literally turned over when Atta looked at me. I thought, 'Why is this man so angry?' He was looking at me sideways, and all this anger and contempt came through. I thought, '*If this guy doesn't look like an Arab Terrorist, nobody does.*' *I've checked in hundreds of thousands of people from all over the world, and he's the only one who made me have that reaction.*

Mel Allen, *The Maine Connection, supra*, XC093266 at 68, (emphasis added), Ex. 7 to the Williamson Decl. *See also* Oprah Tr., XC058696 at 98, Ex. 16 to the Williamson Decl.; Tuohey Tr. at 173:19-174:3, 195:7-13.

i)    Mr. Tuohey has admitted that "[t]here were red flags going off inside [of him], especially the stare-down, which seemed like an awful long time." Oprah Tr., XC058696 at 98, Ex. 16 to the Williamson Decl.; *see also* Tuohey Tr. at 195:25-196:2, 196:13-19, 292:19-293:14, Ex. 5 to the Williamson Decl.

j)    Mr. Tuohey has also admitted that he suspected that Omari was a terrorist.[5] *See* Federal Bureau of Investigation Interview of Michael F. Tuohey, US-001569 at 74, Ex. 11 to the Williamson Decl.; Tuohey Tr. at 174:18-175:5, 195:25-196:2, 196:13-19, 278:18-279:2, Ex. 5 to the Williamson Decl.

k)    Mr. Touhey recognized that Omari did not "understand a word [Tuohey] was saying" but was somehow "answering the [security] questions right."

---

[5] Tuohey told the FBI on Sept. 12, 2001 that his initial reaction was, "here are a couple of terrorists." Federal Bureau of Investigation Interview of Michael F. Tuohey, US-001569 at 74, Ex. 11 to the Williamson Decl.; *see also* Oprah Tr., XC058696 at 98 ("if this guy doesn't look like a terrorist, nobody does"), Ex. 16 to the Williamson Decl.

Oprah Tr., XC058696 at 99, Ex. 16 to the Williamson Decl.; *see also*
Tuohey Tr. at 166:16-167:14, Ex. 5 to the Williamson Decl.

l) Incredibly, Mr. Tuohey had every opportunity, but did *nothing* to stop the
terrorists from boarding the US Airways/Colgan flight.[6] *See* Greg
Szymanski, *New Questions About Real Identity of 9/11 Hijackers, supra,*
XC093257 at 58, Ex. 10 to the Williamson Decl.; *see also* Tuohey Tr. at
179:12-183:16; 291-298, Ex. 5 to the Williamson Decl.

m) Mr. Tuohey failed to interrogate or psychologically profile these terrorists.
*See* Tuohey Tr. at 171:16-172:4, 176:4-177:2, Ex. 5 to the Williamson
Decl.

n) Mr. Touhey failed to report to or warn *anyone*, such as US Airways'
ground security coordinator ("GSC"), the Portland security checkpoint,
American Airlines in Boston, law enforcement or security officials at
Logan or Portland, the FAA or the FBI about his objective and subjective
concerns, beliefs, instincts or suspicions that Atta and Omari were
terrorists. *See* Tuohey Tr. at 179:12-183:16; 291-298, Ex. 5 to the
Williamson Decl.; Deposition Transcript of James Dillon ("Dillon Tr.") at
62:21-65:6, Ex. 18 to the Williamson Decl.; Deposition Transcript of Paul
Burrows ("Burrows Tr.") at 103:15-111:12, Ex. 19 to the Williamson
Decl.; Carbone Tr. at 259:6-262:15, Ex. 9 to the Williamson Decl.

o) Mr. Touhey did *nothing* to ensure that Atta's checked bags were searched
or otherwise subject the terrorists to any additional scrutiny. *See* Touhey
Tr. 157-160, Ex. 5 to the Williamson Decl.

p) After easily defeating US Airways' wholly inept prescreening security,
Atta and Omari proceeded without incident through the Portland security
checkpoint. As of September 11, US Airways'/Colgan delegated their
mandatory checkpoint security obligations to Globe Aviation ("Globe"), a
private security company. *See* General Terms Agreement for Pre-
Departure Screening, Skycap and Other Services between US Air, Inc. and

Globe Aviation Services Corporation, US-000350, at 353, Ex. 3 to the Williamson Decl.; *see also* Staff Monograph, at 3, Ex. 6 to the Williamson Decl.

q)      The Portland airport only had one checkpoint. *See* Staff Monograph, at 3, Ex. 6 to the Williamson Decl. Besides US Airways/Colgan, Continental was among the other air carriers operating out of Portland on September 11. *See* Portland Airport Security Program, at COP000045-46, Ex. 13 to the Williamson Decl.

r)      Continental entered into a "Shared Responsibility Agreement" with US Airways/Colgan, and others, concerning the Portland checkpoint. *See* 8/9/01 Shared Responsibility Agreement-PWM, TSA Delta 00890, Ex.75 to the Williamson Decl.

s)      Despite this ostensibly additional layer of security, Globe's checkpoint personnel failed to identify that Atta and Omari were terrorists or the obvious fact that these terrorists were carrying lethal, prohibited weapons on their person and in their carry-on baggage. *See* Staff Monograph, at 3-4, Ex. 6 to the Williamson Decl.

t)      Yet again, incredibly, neither Omari nor Atta were subjected to a hand-wanding, or a pat-down, or had their respective carry-on bags physically inspected by anyone, despite the fact that, according to at least two Globe screeners on duty on September 11, CAPPS selectees, such as Atta, were required under the minimum standards to be given heightened checkpoint scrutiny, particularly where, as here, Atta set off the walk-through metal detector. *See* Staff Monograph, at 3-4, Ex. 6 to the Williamson Decl.; Deposition Transcript of Barbara Foster ("Foster Tr.") at 80:2-10, Ex. 22 to the Williamson Decl.; Deposition Transcript of Anthony Genovese ("Genovese Tr.") at 63:18-64:10, 74:8-75:12, Ex. 21 to the Williamson Decl.; Burrows Tr. at 90:3-9, Ex. 19 to the Williamson Decl.

---

[6] "I cannot tell you…how many nights I second-guessed myself for not stopping them." *See* Greg Szymanski, *New Questions About Real Identity of 9/11 Hijackers*, *supra*, XC093257 at 58, Ex. 10 to the Williamson Decl.

u)  As the terrorists waltzed through the checkpoint, none of the Globe screeners interrogated these terrorists or scrutinized the terrorists' behavior. *See* Foster Tr. at 71:15-72:3, 79:17-25, Ex. 22 to the Williamson Decl.

v)  One of the checkpoint screeners admitted that she and another screener were distracted by, as she described it, terrorist Atta's "beautiful blue shirt." *Id.* at. 71:4, 90:25, 91:10.

w)  Still photographs from the Portland surveillance video show another Globe screener, who was apparently responsible for the metal detector, lazily leaning up against the x-ray machine and staring off into space as the terrorists breached security. *See U.S. v. Moussaoui* Trial, Government Exhibits FO07021-4 (stills from a security camera at the Portland airport security checkpoint on Sept. 11, 2001), Ex. 23 to the Williamson Decl.

x)  One Globe screener also testified that, when Atta set off the metal detector, he was carrying a cup of coffee and that no one inspected the coffee to determine whether it contained Atta's knife, box cutter or pepper spray. *See* Foster Tr. at 77:8-79:12, Ex. 22 to the Williamson Decl. Indeed, the fact that no one inspected Atta's coffee cup is astonishing given that hiding weapons in coffee cups was a procedure used to test screeners. *See generally* Matthew Brelis and Matt Carroll, *FAA Finds Logan Security Among Worst in US*, Boston Globe, Sept. 26, 2001, XC 088408 at 10, Ex. 24 to the Williamson Decl.

y)  Furthermore, according to the 9/11 Commission's scathing review of the video from the Portland checkpoint on September 11, 2001, the Globe checkpoint screeners failed to employ the FAA-mandated "random and continuous" searches of the terrorists' carry-on bags, which would have given the screeners a markedly better chance at finding their weapons.[7] *See* Staff Monograph, at 75, Ex. 6 to the Williamson Decl.

---

[7] Had the screeners properly identified these weapons, they would have been required to notify a GSC and a law enforcement official. *See US Airways' Checkpoint Operation Guide* § 6: Special Procedures, US-001180 at 1198, Ex. 25 to the Williamson Decl.

z)    Finally, had Mr. Tuohey, at a minimum, notified a US Airways' GSC or the Globe checkpoint of suspected terrorists Atta and Omari, the GSC and the Globe screeners would have, at a minimum, performed a hand wand and a pat down of Atta and Omari, and could have subjected the terrorists to questioning. *See Checkpoint Operation Guide* § 6: Special Procedures, US-001180 at 1226, Ex. 25 to the Williamson Decl. *See also* Genovese Tr. at 75:19-76:15, Ex. 21 to the Williamson Decl.

aa)    After easily and successfully flouting the inept and virtually nonexistent prescreening, checkpoint screening, and checked baggage layers of security in Portland, Atta and Omari boarded the US Airways/Colgan flight to Logan where they joined three of their fellow co-conspirators, boarded American Airlines Flight 11, attacked the passengers and crew with their weapons, took physical control of the aircraft and crashed it into the North Tower of the World Trade Center. *See* Staff Monograph, at 3, 6-15, Ex. 6 to the Williamson Decl.

ab)    Simultaneously, following the same plan, five of Atta and Omari's co-conspirators also took control of Flight 175, which also left Logan at the same time (8:00 a.m.) for the same destination (Los Angeles), and similarly crashed that flight into the South Tower of the World Trade Center. *See* Staff Monograph, at 2-10, Ex. 6 to the Williamson Decl.

ac)    After he heard of the terrorist attacks on the World Trade Center, Mr. Tuohey's first reaction was, "I was right. This guy was a terrorist." Oprah Tr., XC058696 at 98, Ex. 16 to the Williamson Decl.; *see also* Tuohey Tr. at 291:15-193:13, Ex. 5 to the Williamson Decl.; Paula Zahn Now Tr., XC051737 at 40 ("I had the devil standing right in front of me... [a]nd I ignored him."), Ex. 17 to the Williamson Decl.

ad)    Mr. Tuohey has candidly admitted that he is "ashamed" he "did not react to [his] instincts." Paula Zahn Now Tr., XC051737 at 38, Ex. 17 to the Williamson Decl.; *see also* Tuohey Tr. at 197:9-16, *but see* Tuohey Tr. at 180:17-182:8, Ex. 5 to the Williamson Decl. Indeed, Mr. Touhey has stated that his reluctance to act in the face of the numerous "red flags" that

he identified on that morning was motivated by a concern that he might
expose his employer to liability if he did what he knew he should have
done:

> This is the most painful thing. I've always trusted my
> instincts. Always. *But you have to know what it was like
> then. If you respond and you are wrong, you get
> screwed...* Suppose they had been just businessmen. They
> don't get to LA. Maybe lose out on a multi-million dollar
> business deal. They sue our airlines for millions. We also
> get fined $1.5 million for racial profiling. *I'd have put the
> whole company in jeopardy.*

Mel Allen, *The Maine Connection, supra*, XC093266 at 68, (emphases
added), Ex. 7 to the Williamson Decl.; *see also* Tuohey Tr. at 182:15-
183:2, Ex. 5 to the Williamson Decl.

ae).    Mr. Tuohey has also admitted that the terrorist threat level in place on
September 11th *required* him to notify security of his concerns:

> Now here I am. I have two young Arabic men in front of
> me. One-way tickets, checking in just minutes before
> departure. *At Level 3, I would have been required to notify
> security.* Their bags would have been opened. What we
> saw would have set off suspicions: A pilot's uniform, a
> video on flying jets. Airline pilots do not buy $2,400 first-
> class tickets. Airline pilots are the cheapest people on
> earth. *Right there, we would have known something was
> wrong. This was preventable.*

Mel Allen, *The Maine Connection, supra*, XC093266 at 69, (emphases
added), Ex. 7 to the Williamson Decl.; *see also* Tuohey Tr. at 232:5-233:4,
Ex. 5 to the Williamson Decl.

af)    Had Mr. Tuohey followed Level 3 security procedures and called security,
security would have found in the bags, in addition to the pilot's uniform
and video, various prohibited and highly suspicious items, such as a four-
page letter written in Arabic describing the knives to be used and the
martyrdom operations to be performed by the terrorists while in flight,
pepper spray and a folding knife, which according to the 9/11
Commission, "were presumably extra weapons the two conspirators

decided they didn't need," and, reportedly, **documentation revealing the names of all of the 19 September 11th terrorists (including the identities of all of the Flight 175 hijackers) and setting forth the September 11th plotters' "plans, backgrounds and motives."** *See 9/11 Commission Staff Statement No. 16*, XC009661 at 71, Ex. 28 to the Williamson Decl.; *U.S. v. Moussaoui* Trial Tr., Testimony of James M. Fitzgerald, XC052730 at 71 (Mar. 7, 2006), Ex. 26 to the Williamson Decl.; *see also* Curtis Morgan, David Kidwell & Oscar Corral, *Prelude to Terror: State a Natural for Training, Blending Into Communities*, The Miami Herald, Sept. 21, 2001, XC060997 at 61004, Ex. 27 to the Williamson Decl.; Michael Dorman, *An Untold Story of 9/11*, Newsday.com (April 17, 2006), Ex. 88 to the Williamson Decl.

34.    In addition to the genuine issues of material fact identified in ¶¶ 1-33, above, the following facts demonstrate that there are a genuine issues of material fact as to what the Moving Defendants knew or should have known on September 11, 2001 about the notoriously lax and ineffective security at Logan Airport:

a)    In 2000, the General Accounting Office ("GAO") highlighted just some of the long-standing problems with the airlines' security system:

> Events over the past decade have shown that the threat of terrorism against the United States is an ever-present danger and, coupled with the fact that aviation is an attractive target for terrorists, indicate that the security of the air transport system remains at risk.  Protecting this system demands a high level of vigilance because a single lapse in aviation security can result in hundreds of deaths… and have immeasurable negative impacts on the economy and the public's confidence in air travel.
>
> *    *    *
>
> FAA and the airline industry have made little progress in improving the effectiveness of airport checkpoint screeners. Screeners are not adequately detecting dangerous objects, and long-standing problems affecting screeners' performance remain, such as the rapid screener turnover and the inattention to screener training.

* * *

The security problems we have found would by themselves
be cause for concern…Taken together, these problems
show the chain of security protecting our aviation system
has not one but several weak links.  It must be recognized
that the responsibility for these problems does not fall on
the shoulders of FAA alone.  The aviation industry is
responsible for undertaking the security measures at
airports and many of the problems identified—such as
rapid screener turnover—more appropriately rest with it.

* * *

Concerns have been raised for many years by us and by
others about the effectiveness of the screeners and the need
to improve their performance.  In 1978, the screeners were
not detecting 13 percent of the potentially dangerous
objects FAA agents carried through checkpoints during
tests—a level that was considered 'significant and
alarming.'  In 1987, we found that screeners were not
detecting 20 percent of the objects during FAA tests.  Two
presidential commissions—established after the bombing
of Pan Am Flight 103 in 1988 and the then-unexplained
crash of TWA Flight 800 in 1996—as well as numerous
reports by GAO and the Department of Transportation's
Inspector General have highlighted problems with
screening and the need for improvements…[P]roblems with
screeners' performance remain a serious concern.

* * *

Many vulnerable areas in the aviation system need strong
protection…It is often said that a chain is only as strong as
its weakest link; in the case of aviation security, there are
still many weak links."

GAO Report, *Aviation Security: Vulnerabilities Still Exist in the Aviation
Security System*, XC001195 at 197-210 (Apr. 6, 2000), Ex. 57 to the
*Williamson* Decl.

b)    At Logan Airport, the checkpoint security personnel were so poorly

selected, paid, motivated, and trained that they had an astounding 207%

turnover rate in 1999. *Id.* at 204.

c)    That year, Logan's security lapses were publicized and were reported to have "had the sixth-highest amount of fines for security breaches" despite being one of the nation's largest airports. *See* Mathew Brelis, *Security Lapses Revealed at Logan: Federal Agents Report at Least 136 Violations*, Boston Globe, Sept. 19, 1999, XC088355, Ex. 58 to the Williamson Decl.; Matt Carroll, *Airlines Foiled Police Logan Probe*, Boston Globe, Oct.17, 2001, XC0088373, Ex. 59 to the Williamson Decl.

d)    In late 2000 and early 2001, the local Boston Fox News television station aired two exposés about Logan's abysmal security. *See* Staff Monograph, at 4, Ex. 6 to the Williamson Decl. In one of the two broadcasts, a Fox News reporter was able to breach checkpoints in each of Logan's terminals while carrying one of the types of knives bought by the terrorists shortly before September 11th.. The knife set off the alarms on each of the walk-through metal detectors, but incredibly, each time, the knife went undetected by the screeners. *See* William F. Jasper, *Unfriendly Skies*, New American, Oct. 18, 2004, XC087812 at 13, Ex. 60 to the Williamson Decl.; *see also The 9/11 Commission Report*, Ch. 1, n. 1, XC002058 at 519, Ex. 8 to the Williamson Decl.

e)    After the broadcasts, Mr. Lawless alerted Massport's public safety group of his belief that airport tenants have not been taking security seriously since: (1) a reporter for Fox 25 was able to sneak contraband through airport checkpoints and such exposé would air in May of that year and (2) an FAA agent was able to completely bypass gate security and board a United Airlines plane." Massport Public Safety Staff Meeting Minutes, XC117728 (Apr. 13, 2001), Ex. 61 to the Williamson Decl.

f)    At his deposition, Mr. Lawless testified that he tried to address the deplorable state of Logan's checkpoint security by instituting various programs and initiatives in the summer of 2001, but the airlines stopped him from doing so. *See* Lawless Tr. at 101:19-102:19, 140:3-142:23, 146:2-13, 153:21-154:3, Ex. 51 to the Williamson Decl.

g)  Mr. Lawless also testified that Logan's "weak link" as of September 11 was checkpoint security. *Id.* at 46:14-24, 91:2-9, 93:17-22, Ex. 51 to the Williamson Decl.

Dated: New York, New York
April 27, 2007

FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
Attorneys for WTCP Cross-Claim Plaintiffs
World Trade Center Properties LLC,
1 World Trade Center LLC,
2 World Trade Center LLC,
4 World Trade Center LLC,
5 World Trade Center LLC, and
7 World Trade Company, L.P.

By:

Richard A. Williamson (RW-3033)
One Liberty Plaza, 35th Floor
New York, New York  10006-1404
(212) 412-9500